## Case No. 2,051.

### BRUGGER v. STATE INV. INS. CO.

[5 Sawy. 304; 7 Reporter, 616; 8 Ins. Law J. 293.][1]

Circuit Court, D. Oregon. Nov. 18, 1878.

MISTAKE IN POLICY OF INSURANCE—AGENT OF INSURANCE COMPANY—INSURANCE INTEREST — RELIEF UPON REFORMED CONTRACT.

1. A mutual mistake in a policy of insurance will be corrected by a court of equity, even after a loss, where the mistake is satisfactorily shown, either from the application or oral testimony.

   [Cited in Spare v. Home Mut. Ins. Co., 17 Fed. 572; Same v. Same, 19 Fed. 19; Durham v. Fire & Mar. Ins. Co., 22 Fed. 470.]

   [See Bailey v. American Cent. Ins. Co., 13 Fed. 250, and note.]

2. When the local agent of an insurance company solicits business for his principal, and prepares the application for a policy, in so doing, prima facie, he is the agent of the company, and his mistakes are its mistakes.

3. A party in possession of a mill belonging to another to whom he advanced a portion of the purchase-money, and who holds such other's power of attorney, authorizing him to dispose of the same, has an insurable interest therein.

4. A court of equity, when it has reformed a contract, may enforce it, or grant such relief upon it as the complainant shows himself entitled to.

   [Cited in Herbert v. Mutual Life Ins. Co., 12 Fed. 808.]

Suit in equity [by J. J. Brugger against the State Investment Insurance Company] to reform and enforce a policy of insurance.

Addison C. Gibbs, for complainant.
John W. Whalley, for defendant.

DEADY, District Judge. This suit is brought to correct an alleged mistake in a policy of insurance against fire, issued by the defendant to the plaintiff on his mill property.

The facts appear to be as follows: During and before the month of July, 1876, the defendant was a corporation formed under the laws of California, and engaged in the business of fire insurance in this state; and A. P. Hotaling & Co., of Portland, were its general agents for the state, while F. Friedenrich was its local agent at Hillsborough, with authority to solicit business—to take and prepare applications, and forward the same to the general agents, and deliver policies, and receive the premiums thereon. During the same period, the plaintiff, a native of Switzerland and an illiterate person, was in the possession of a three-story frame mill situated on the west side of the base line road, in Washington county, Oregon—the legal title to the property being in his brother, but the plaintiff holding a power of attorney to dispose of the same in consideration of money advanced by him to assist his brother in the purchase thereof. True, the amended bill alleges that the plaintiff was the owner of the property unqualifiedly and this is denied by the answer. But in the application for the policy the plaintiff stated the nature of his interest in the property correctly, and on the argument it was admitted that this was an insurable interest. Of this there can be no doubt upon authority. Wood, Ins. § 248 et seq. And because it also appears that the defendant with full knowledge of the facts issued a policy to the plaintiff and accepted the premium thereon, it is now estopped to say, the plaintiff had

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 7 Reporter, 616, contains only a partial report.]

no insurable interest in the property for the purpose of avoiding the policy. Id. § 498.

The plaintiff being so in possession, after previous solicitation by said Friedenrich, on July 15, 1876, applied to said agent for a policy upon said property against fire, in which the same appears to be described as a "building" valued at four thousand dollars, to be insured for three thousand dollars at four per centum premium. This application was made upon one of the defendant's blanks, entitled "Store buildings and merchandise survey," and was filled up by the agent and by him soon after transmitted to Hotaling & Co., where the clerk in charge of this business, on July 20, 1876, filled out a policy for one year upon the plaintiff's "three-story frame water power mill building," for the sum, and at the rate aforesaid and forwarded the same to Friedenrich at Hillsborough for delivery to the plaintiff upon the payment of the premium. At the time the application was delivered to the clerk at the place of Hotaling & Co., he remarked to the party delivering it that it was made out on the wrong blank, and taking up one containing many more questions and intended for the survey of mill property filled it up so far as the information contained in the one already signed by the plaintiff would permit, and handed it to the party, saying that he would issue the policy and send it to Friedenrich, but to take the mill blank to Hillsborough and have the filling up completed there and have it signed by the plaintiff. This second blank was taken to Hillsborough on the afternoon of the same day. The filling up was completed by Friedenrich and the paper signed by the applicant, and the policy delivered to him and the premium paid by him within a day or two from the date of the policy. The first blank remained at the place of Hotaling & Co., and the second one with Friedenrich, by whom it was kept to serve as a guide for similar cases, he having no experience in the business. The plaintiff took the policy home with him without reading it—in fact, was unable to read it. On July 8, 1878, the mill building and machinery were destroyed by fire. Upon application to Hotaling & Co., for the insurance, they claimed that the policy only covered the building and offered to pay the plaintiff fifteen hundred dollars for the loss. This the plaintiff refused, and insisted that it was his understanding that the machinery was included in the risk—particularly that which was fixed in its character.

On the first application, which is called Exhibit No. 1, there is no description of the property except the printed words or formula—"On buildings" with the "s" crossed out, followed by the figures in writing—"$4,000," "$3.000" and "$4.00" under the words "Valuation"—"Sum to be insured" and "Rate," respectively. These figures are not in the handwriting of Friedenrich, and appear to be in that of the clerk of Hotaling & Co. who wrote the word "building" and the same figures thereafter in the second application, called Exhibit C. Therefore it appears there was no description of the property in the first application when signed by the plaintiff on July 15, 1876. The Exhibit C was filled up partly by the clerk aforesaid, and in answer to the forty-second question therein—"What is the cash value of the building or buildings above the foundation?"—he wrote $4,000; but when the application came to Friedenrich, at Hillsborough, and he completed the filling up, he drew a line through the figures "$4,000" and wrote "$2,000" in their place; and in answer to the subdivision "B" of the same question, on the next line below—"Of the machinery," that is the value—he wrote $2,000—thus making the application read in effect, the value of the building and machinery together is $4,000. This application is signed by the plaintiff but not dated. For the defendant it is suggested rather than asserted that it was not signed until after the policy was delivered, and probably not until after the fire. But the only persons who know what is the truth of the matter are the plaintiff and the defendant's agent, Friedenrich, and they both swear positively that it was signed before the delivery of the policy.

On this state of facts both Exhibits No. 1 and C ought, I think, to be considered parts of one and the same application, unless the latter should be regarded as superseding the former altogether. But in either view of the matter, although only the word "building" is used in No. 1 to denote the property insured and also in the general description in C, yet the fact being that in the more particular statement as to value in C, the four thousand dollars is equally distributed between the building and the machinery, it is satisfactorily shown that it was the intention of the parties to the contract to include them both in the policy. But insurers are presumed to be acquainted with the nature of the property they insure. And when we consider how unreasonable, if not absurd, it is to suppose that any sane man would propose to insure a mill-house—the mere shell or covering—against fire and leave the more valuable machinery exposed to almost certain destruction and loss in case the house was burned, it seems clear that this application was neither made by the plaintiff nor received by Friedenrich as for insurance upon the shell or building only, but for the property as a whole—the house and machinery. Besides the amount upon which the premium was paid by the plaintiff and received by the defendant was manifestly more than the value of the mere building, and this tends to show also that something more was intended and agreed upon than a policy on the house alone. It is not to be presumed that the plaintiff would insure his mill building for more than twice its value when from the nature of the case, if it was destroyed by fire,

its real value could be shown. If it was a stock of goods, or something the character and value of which was not known to the whole neighborhood, it might be otherwise. Neither is it to be presumed that the defendant would insure a mill building at twice its value in the face of its own positive rules, which prohibit its agents from taking a risk on any property for more than three fourths of its value. Indeed this mistake seems to be one of the kind that may be fairly implied from the nature of the transaction, and therefore it is not necessary to resort to positive proof thereof. 1 Story, Eq. Jur. § 162. In Phoenix Fire Ins. Co. v. Gurnee, 1 Paige, 278, the application for the insurance described the property as "a two-story-and-a-half frame grist mill," while the policy described it as a "frame mill house." After a loss by fire and a refusal on the part of the company to correct the mistake, the court reformed the policy so as to include both the mill and machinery therein. In the determination of the case much weight was given to the consideration, that it was unreasonable to suppose that any one would make a contract for insurance upon a mill house alone. In the course of the opinion the chancellor says: "It is to be presumed that insurers are acquainted with the nature of the property which they undertake to insure. If so, the defendant must have known that no owner of a grist mill would ever think of insuring the mill house only, leaving all the substantial parts of the mill exposed to certain destruction if the mill house or covering was destroyed."

But the case does not end here. Both the plaintiff and Friedenrich swear positively that it was the intention and understanding of both parties that the policy should cover the machinery as well as the house. This testimony stands not only uncontradicted and unimpeached, but is corroborated and supported by every known fact and reasonable inference in the case. It appears probable that both the agent and the plaintiff thought that the term, "mill-building," properly included the machinery which made and constituted it a mill; and in this respect they were not singular. Most persons, other than experts and professionals, would understand an application to insure a mill property to be well expressed by the term mill-building—particularly if the proposed valuation was manifestly more than double the value of the mere house.

The law applicable to these facts is well settled, so far as this court is concerned. When Friedenrich filled up the Exhibits Nos. 1 and C, he was acting as the agent of the defendant, and any mistake made by him in so doing, is attributable to the defendant, and it must bear the consequences. For the purposes of this case the defendant, during these transactions, was present at Hillsborough, soliciting this business, and making out these applications, because it did so by its agent, Friedenrich. In Union Mut. Life Ins. Co. v. Wilkinson, 13 Wall. [80 U. S.] 234, the question was directly considered, and Mr. Justice Miller, speaking for the court, says: "The powers of the agent are prima facie co-extensive with the business entrusted to his care, and will not be narrowed by limitations not communicated to the person with whom he deals. An insurance company establishing a local agency, must be held responsible to the parties with whom they transact business, for the acts and declarations of the agent, within the scope of his employment, as if they proceeded from the principal." See, also, Wood, Ins. § 384. But in the case at bar we are not left to presumption as to the authority of the local agent. As has been stated, he was expressly authorized to take and prepare applications for insurance; and in this case did so with a full knowledge of the facts, freely and fairly communicated to him by the plaintiff. If from either ignorance or carelessness he erred, the error is the defendant's, and the plaintiff is entitled to have it corrected. In Hearne v. New England Mut. Marine Ins. Co., 20 Wall. [87 U. S.] 490, Mr. Justice Swayne announces the rule as to the reformation of written contracts for fraud or mistake, as follows: "Where the agreement, as reduced to writing, omits or contains terms or stipulations contrary to the common intentions of the parties, the instrument will be corrected so as to make it conform to their real intent. The parties will be placed as they would have stood if the mistake had not occurred. The party alleging the mistake must show exactly in what it consists, and the correction that should be made. The evidence must be such as to leave no reasonable doubt upon the mind of the court as to either of these points. The mistake must be mutual and common to both parties to the instrument. It must appear that both have done what neither intended. A mistake on one side may be a ground for rescinding, but not for reforming a contract. Where the minds of the parties have not met there is no contract, and hence none to be rectified." See, also, 1 Story, Eq. Jur. § 152 et seq.

In Gillespie v. Moon, 2 Johns. Ch. 597, Chancellor Kent showed that in equity parol evidence was sufficient to reform a mistake in a written contract, and said, "The only question is, does it satisfy the mind of the court?" This case was followed by Lyman v. United Ins. Co., Id. 632, in which he said the mistake must be made out "to the entire satisfaction of the court." See Wood, Ins. 796. In my judgment this is a very plain case. The defendant has had the benefit of a premium upon this risk—including the kernel as well as the shell—and ought to perform its part of the agreement accordingly. Indeed, it would be a reproach to the administration of justice, and an admission of a serious defect in the moral juris-

diction of this court, if, under these circumstances, the plaintiff could not have relief from this plain mistake and consequent gross wrong. The case has been tried upon the assumption that the court, if it reformed the policy, would retain the case and enforce the contract as reformed. There is no doubt as to the authority of the court to do this, and the propriety of it is apparent. Story, Eq. Jur. § 161. After the instrument is reformed, all of the facts necessary for a decree are admitted, unless it is the value of the property, and that, taking the answer and evidence together, is plainly shown to be greater than the sum it was insured for. But as it now appears that the prayer for relief goes no farther than for the reformation of the policy, the plaintiff may amend the prayer so as to ask for such relief as he may be entitled to upon the contract when reformed as prayed for.

The decree of the court will be that the policy be reformed so as to include the machinery of the mill as well as the house; and that the plaintiff recover off the defendant the sum of three thousand dollars, with interest upon the same at the rate of ten per centum per annum, from sixty days after the loss, to wit, September 8, 1877, to the date of this decree, together with the costs and disbursements of this suit.